Donald M. Anderson, et al., Plaintiffs-Appellants, v. Continental Casualty Company, et al., Defendants-Appellees.

Gen. No. 67–102.

Second District.

June 24, 1968.

Tuite, Shaw, Barden and Morrissey, of Rockford, and Shulman & Baum, of Chicago, amicus curiae, for appellants.

Reno, Zahm, Folgate and Skolrood, and Miller, Hickey, Collins, Gilbert & Powers, of Rockford, for appellees.

MR. JUSTICE MORAN delivered the opinion of the court.

This case involves the interpretation of a group insurance policy issued by the defendant Continental Casualty Company to the defendant trustees of the Construction Industry Welfare Fund of Rockford, Illinois. The Welfare Fund was established in 1954, pursuant to a collective bargaining agreement between employers in the construction industry and various trade unions in that industry, including Local No. 364 of the International Brotherhood of Electrical Workers. Pursuant to the terms of the collective bargaining agreement, the employers contributed 5¢ per hour (raised to 10¢ per hour in 1955) into the fund for each hour worked by an employee. The fund was administered by six trustees, three of whom were designated by the employers and the other three were designated by the union. The purpose of the fund was to procure group health, accident and life insurance for the employees. The trust agreement provided that the employer contributions should be used to pay premiums on policies of insurance, to pay the costs of administering the fund (including the leasing of premises, payment of salaries of administrative and clerical personnel, purchase of supplies, and the like), as well as to accumulate reserves. The agreement further provided that the trustees could, in their sole discretion, invest any funds, which they considered not to be required for current expenditures, in bonds or obligations of the United States Government. The fund was established pursuant to the authority granted by section 302(c)(5) of the Labor Management Relations Act of 1947, 29 USC, commonly known as the Taft-Hartley Act.

The trustees did procure group insurance from the defendant Continental Casualty Company, and the premiums were paid from the employer contributions. In 1966, Local 364 of the Electrical Workers Union negotiated a new collective bargaining agreement with the

employers, pursuant to which, effective May 1, 1966, the employers would no longer make contributions to the fund in question, but would, insofar as the electrical workers were concerned, make the contributions to a new welfare fund having no connection with the fund in question. Pursuant to that agreement, the employers did in fact cease making contributions to the old fund as of that time.

█ The plaintiffs in this case are members of Local 364, and the basic question is whether they are entitled to insurance benefits from the old fund for claims which arose subsequent to May 1, 1966, at which time their employers were no longer making contributions to the old fund. The reason the question arises is that the claims in question arose during the exclusionary period under the new fund, when plaintiffs were not eligible for the new coverage provided by that fund. Accordingly, if they are not entitled to benefits under the terms of the old policy, their claims are not covered by any insurance at all.

The case was tried in the lower court on an agreed statement of facts, supplemented by some testimony. The trial court held that plaintiffs were not entitled to benefits under the old policy for the claims in question, and they appeal from this determination.

To summarize the positions of the parties, plaintiffs claim that, under the eligibility provisions of the old policy, they are entitled to benefits for the claims in question, even though the claims arose after their union ceased to participate in the old fund and their employers had ceased to make contributions on their behalf to the old fund. The defendant trustees and the insurance company, on the other hand, contend that coverage terminated when plaintiffs' union withdrew from the fund and the employers ceased contributing on behalf of the plaintiffs.

The matter is not free from doubt, because neither the trust agreement nor the insurance policy states, in so many words, what happens upon the contingency here involved. However, we believe the matter can be resolved by a reasonable construction of the terms of the insurance policy. (The record does not contain the master insurance policy, but only a specimen of an individual certificate of insurance, evidencing the insurance but not necessarily purporting to set forth all terms of the policy. As we will later point out, this is perhaps unfortunate. However, since neither side has raised any question as to the adequacy of this certificate to evidence the actual terms of the policy, we will proceed on the assumption that the certificate is adequate for our purposes.)

We will first consider the positions of the defendants. They rely upon two provisions of the insurance certificate (which we will hereafter refer to as the policy). The first of these provisions is the following:

> "Any Employee Member of a Participating Union or a Participating Employer within the various jurisdictions of the Fund, shall be eligible for insurance coverage providing that sufficient Credited Hours have been recorded to his account."

Defendants take the position that this provision limits eligibility to those employees who are members of a Participating Union or employed by a Participating Employer *at the time their claims arise.* Even standing alone, we do not believe this language is subject to that interpretation. The provision appears in the introductory portion of the policy, and we think it simply describes the persons who are participating in the fund, without purporting to prescribe the conditions for payment of a particular claim. The quoted provision does not specify what the relationship is between the *time* of participation and the eligibility for benefits, and this is the crucial

question in the case. The provision does provide one specific limitation, namely, that sufficient credited hours have been recorded to the employees' account, but, as we will see later, the parties agree that the plaintiffs in this case met that requirement.

The other policy provision upon which the defendants rely is the following:

"Individual Terminations

"The insurance of the Insured Person shall terminate: (1) on the date the policy is terminated; (2) as of the premium due date when the Trustees fail to pay the required premium for the Insured Person except as the result of inadvertent error; (3) on the date the Insured Person ceases to be eligible for insurance according to the rules for eligibility established by the Trustees and agreed to by the Company; (4) on the date the Insured Person, if a Dependent, ceases to be a Dependent as defined."

The foregoing provision sets forth four conditions under which the insurance of an employee is terminated. The first and fourth conditions are not involved here, but defendants rely upon conditions (2) and (3). As to condition (2), the defendants, and especially the insurance company, point out that, as of May 1, 1966, the trustees ceased paying premiums to the company for the plaintiffs. Defendants take the position that, since the trustees did not pay premiums, there should be no insurance. However, this argument begs the question. The policy provides that the trustees shall pay premiums for employees who are eligible, and, if in fact the plaintiffs were eligible, the premiums should have been paid. In our view, the nonpayment of premiums is unavailable as a defense to the insurance company if it is unavailable to the trustees, because, as we will point out later, we

believe the trustees were the agents of the company for the purpose of determining eligibility and remitting the required premiums.

We turn now to condition (3) of the above-quoted provision concerning "Individual Terminations." Defendants contend that, according to this provision, plaintiffs ceased to be eligible when they ceased to be members of a participating union or employees of a participating employer, since membership in one of those categories, by virtue of the earlier provision we have already considered, was a condition of eligibility. We have already pointed out that we do not regard the earlier provision as amounting to such a limitation.

We turn now to the position of the plaintiffs. They rely upon the following language of the policy:

"Determination of Eligibility

"Eligibility for Benefits shall be determined at the time a claim is adjusted and the benefits shall be based on the number of hours credited to a Member's account within a specific period of time preceding the month in which the disability or death occurs.

"This determination of eligibility shall be called a test. Any Member of the Fund who was not eligible as of August 1, 1965 under the Rules then in effect shall be considered a new Member in the Fund when filing claims—whether for Accident, Illness, Death Benefits or continuous eligibility for Free Coverage.

"Tests

"The following tests shall be applied to determine the class of benefits (other than Life Insurance) for which a Member is eligible—the tests are made in the following manner in order to provide the greatest amount of benefits available to the Member:

307

"Test 1

"The first test of eligibility shall be to determine if at least 1800 Credited Hours had been accumulated during the first 12 months of the 13 month period immediately preceding the month during which the disability occurred.

"Members satisfying this test shall be eligible for Class A Benefits.

"Test 2

"The second test of eligibility shall be to determine if at least 1,200 but not more than 1,799 Credited Hours had been accumulated during the first 12 months of the 13-month period immediately preceding the month during which the disability occurred.

"Test 3

"The third test of eligibility shall be to determine if at least 780 Credited Hours had been accumulated during the first 7 months of the 8 month period immediately preceding the month during which the disability occurred.

"Test 4

"The fourth test of eligibility shall be to determine if at least 390 Credited Hours had been accumulated during the first 3 months of the 4 month period immediately preceding the month during which the disability occurred.

"Members satisfying tests 2, 3 or 4 shall be eligible for Class B Benefits.

"Test 5 (NOTE: This test shall determine All Class D Benefits including Life Insurance)

"The fifth test of eligibility shall be to determine if at least 1,200 Credited Hours had been accumu-

lated during the first 17 months of the 18 month period immediately preceding the month during which the disability occurred.

"Members satisfying this fifth test only, shall be eligible for Class D Benefits."

It is stipulated in the agreed statement of facts that all of the plaintiffs were eligible for benefits under either Test 1 or Test 2 above. That is, each of the plaintiffs had either (1) at least 1,800 credited hours during the first twelve months of the thirteen-month period immediately preceding the month of his disability, or (2) at least 1,200 credited hours during the first twelve months of the thirteen-month period immediately preceding the month of his disability.

A "credited hour" for an employee, under the terms of the policy, is an "hour of his employment as reported by his employer(s) to the Fund Office and for which contributions at the rate required by the Collective Bargaining Agreement have been received by the Fund." The policy specifies the various classes of benefits, and, as one would expect, the scope of benefits decreases as the credited hours decrease.

Plaintiffs take the position that, since they had accumulated the necessary number of credited hours in relation to the claims they now assert, they are, by virtue of the foregoing eligibility provisions, entitled to benefits notwithstanding the fact that they are no longer participating in the fund. We agree with their contention. We find nothing in the policy, nor in the trust agreement, which indicates that an employee's right to benefits terminates under the conditions here presented, so long as he has the necessary credited hours. We believe that the foregoing eligibility tests make it reasonably clear that the important factor is simply the number of credited hours the employee has accumulated. From the contributions represented by those hours, the trustees were obliged to make premium payments to the insurance

309

company for the employee. If it had been intended to terminate an employee's eligibility for benefits when he was no longer employed by a participating employer, or a member of a participating union, the policy could have so provided in express terms. We find it significant that, even in the "Individual Termination" section of the policy, quoted above, there is no such provision. Condition (3) of that section states that an employee is terminated when he "ceases to be eligible for insurance according to the rules for eligibility established by the Trustees and agreed to by the company." Construing this language in the light of the policy as a whole, we believe that condition (3) refers to the inability of a person to meet one of the five "tests" of eligibility quoted above.

The defendants argue, and the trial court adopted the argument, that current employer contributions are used to pay premiums to provide current coverage. Thus according to this argument, since no contributions were made by the employers after May 1, 1966, there could have been no premiums paid and no coverage afforded after that time. However, this argument is not supported by the record and is, we think, belied by the entire scheme of eligibility tests set forth in the policy. If current claims can be paid only from coverage afforded by premiums paid from current contributions, we fail to see what purpose the elaborate eligibility tests would have. Moreover, the record establishes that, in actual practice, there has been no strict correlation between current employer contributions, current premium payments and payment of current claims. It appears that the administrator of the fund pays the premiums to the company of a monthly basis, based upon the "estimated" number of employees currently eligible for coverage. Under the terms of the policy, employer contributions to the fund are not even credited to the employee for the month in

which he did the work upon which the contributions were based:

> "Hours contributed . . . shall be recorded for the month previous to the month in which they are received by the Fund. Postmark date will be considered if it has bearing on the recording date. For example: Hours worked in June and July but not received until October, will be recorded as having been worked in September."

Although there is testimony by the fund admininstrator that premiums were sent to the company monthly, the record is silent as to what *period* of coverage is acquired by a particular premium payment. The insurance policy says nothing about the relationship between premiums and periods of coverage, and the reason for this would seem to be that the question is answered simply by reference to the eligibility tests. In other words, if an employee has sufficient credited hours to meet a particular test, he is entitled to coverage of the classification corresponding to that test. We can only assume that the amount of the premiums established by the insurance company are sufficient to provide the kinds of coverages applicable to each of the tests.

The record does not disclose how much money there is in the fund. The trust agreement, in providing for the payment of administration expenses, the accumulation of reserves and the investment of money in government bonds, clearly contemplates that employer contributions will exceed the amount needed for premium payments. This is another factor which leads us to the conclusion that there is no merit to defendants' contention that current coverage must depend upon current contributions.

To summarize our analysis of the insurance policy, we believe that the "eligibility tests" clearly disclose an in-

tention to provide prospective insurance coverage based upon past contributions to the fund, with the extent of the coverage depending upon the extent of the past contributions. The provisions relied upon by defendants, especially when read in the light of the eligibility tests, do not, in our opinion, lend themselves to the interpretation that an employee forfeits his accumulated hours when contributions cease. Finally, our conclusion is fortified by the fact that in the portion of the policy dealing specifically with individual terminations, there is no provision for termination without regard to past contributions when an employee ceases to be a member of a participating union or employed by a contributing employer.

Our interpretation of the policy is consistent with what the prior understanding of the defendants apparently has been. The record discloses that, in at least one previous instance, with no objection by anyone, insurance benefits were paid to employees for claims which arose after they had terminated their employment with a participating employer and after contributions on their behalf had ceased. The administrator of the fund, testifying under section 60 of the Civil Practice Act, testified that the practice of the Fund Office had been to pay claims simply on the basis of whether or not the claimant met one of the tests of eligibility, without regard to his current employment status. He pointed out that construction workers are engaged in a type of work where they might change jobs frequently and encounter substantial periods of unemployment. The eligibility rules were apparently designed with those factors in mind.

We hold, therefore, that, since it is agreed that plaintiffs met the required eligibility tests, the trustees should have paid the necessary premiums to afford them coverage for the claims in question. Under the terms of the trust agreement, the trustees had the duty to pay the necessary premiums.

■ The only remaining question is whether the defendant insurance company is liable to the plaintiffs, assuming that the premiums had not been paid. (Both sides assume that the premiums were not paid. In view of what we have said about the somewhat indefinite relationship between premiums and current contributions, we would not be so quick to make that assumption. The record does not even disclose when the claims in question arose.) The evidence is clear that the insurance company delegated all administrative functions concerning the insurance to the defendant trustees. The trustees made all determinations concerning eligibility, provided the claim forms to claimants, determined the amount of benefits to be paid, and actually paid the claims by issuing drafts on forms provided by the insurance company. Under these circumstances, we have no hesitation in concluding that the trustees were the agents of the insurance company for purposes of remitting the required premiums to the company. If the trustees did in fact fail to remit the premiums which would have provided the coverage in question, their failure to do so is chargeable to the defendant insurance company and cannot be relied upon by the company to escape liability. Patterson v. John Hancock Mut. Life Ins. Co., 27 Ill App 2d 135, 143–144, 169 NE2d 183 (1960).

For the foregoing reasons, the judgment of the lower court is reversed and the cause is remanded for entry of a new judgment order in conformity with the views expressed in this opinion.

Reversed and remanded.

ABRAHAMSON, P. J. and SEIDENFELD, J., concur.